**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------

BRIAN SANTONE, also known as Brian Irwin,

                                              Petitioner,

              v.                                              No. 04-CV-947
                                                                (NAM/DRH)

BRIAN FISCHER,

                                              Respondent.
--------------------------------------------------------------

**APPEARANCES:**                              **OF COUNSEL:**

JONATHAN I. EDELSTEIN, ESQ.
Attorney for Petitioner
20th Floor
271 Madison Avenue
New York, New York 10016

HON. ANDREW M. CUOMO                          PAUL B. LYONS, ESQ.
Attorney General for the State                Assistant Attorney General
      of New York
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

        Petitioner Brian Santone, also known as Brian Irwin ("Irwin"),[2] is currently an inmate

in the custody of the New York State Department of Correctional Services ("DOCS").  On

November 9, 2001, a jury convicted Irwin of three counts of assault, one count of criminal

────────────────────

        [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

        [2] "Petitioner has legally changed his name to Brian Santone.  However, because
the original petition and all of the documents relating to the State court proceedings refer
to him as Irwin, he will be referred to as such here."  Edelstein Decl. (Dkt. No. 47-2) ¶ 2,
n.1.

possession of a weapon, and two counts of intimidating a witness.  T. 721-26.[3]  On

December 19, 2001, Irwin was sentenced as a second felony offender principally to

sixteen to eighteen years imprisonment.  S. 12.[4]  Irwin now seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 on the grounds that (1) the evidence was insufficient to

support the conviction,  (2) he was denied his right to be present at side bars, and (3) his

trial counsel rendered ineffective assistance.  Am. Pet. (Dkt. No. 47) at 5-9.  For the

reasons that follow, it is recommended that the petition be denied.


## I.  Background

The criminal charges against Irwin arise from the stabbing of Stephen Smalls[5] in

the early morning hours of September 3, 2000 on Clay Street in Watertown, New York.  T.

at 431.


## A. Jury Selection

On November 5, 2001, Irwin's trial began.  T. 1.  Irwin was represented by Richard

J. Graham, Esq.  During a pretrial conference, Graham and Irwin both heard the Assistant

District Attorney report that she intended to call twenty-one witnesses during the

prosecution's case.  T. 3.  The parties also discussed a plea agreement requiring a guilty

---

[3] "T." refers to citations from the trial transcript.  Dkt. Nos. 50-2-50-28 at 123.  All citations will be to the pagination indicated on the trial transcript.

[4] "S." refers to citations from the sentencing transcript.  Dkt. No. 50-28 at 124-37. All citations will be to the pagination indicated on the trial transcript.

[5] Smalls was unavailable to testify at trial.

plea to a charge carrying a determinant sentence of three years.  T. 6.  The trial judge

clarified that, if the deal was rejected, Irwin would be looking at a minimum of eight years

and a maximum of twenty-five, but Graham rejected the deal for Irwin.  Id.  The trial judge

then asked Irwin if he understood the consequences of a minimum sentence and what his

second felony offender status meant if he was convicted, and confirmed that Irwin was

"still unwilling or unable to accept the People's offer. . . ."  T. 6-8.  The trial judge explicitly

warned Irwin that, based on his criminal history, it would be "a pretty sure bet that [he]

would not get the minimum if [he was] convicted of the top count . . . .," to ensure that Irwin

fully understood the potential risk he was taking if he chose not to accept the plea deal  T.

8-9.  Irwin declined further consultation with Graham and again rejected the plea offer.  T.

9.

 Graham then moved to exclude parts of Irwin's criminal history.  T. 10-12.  Irwin had

previous convictions for possession of a controlled substance, reckless endangerment,

driving while under the influence, and bail jumping.  T. 11-12.  The trial judge limited the

scope of questioning regarding one of the prior convictions.  Id.

 Jury selection then commenced.  T. 18-280.  Prior to any side bar conferences, the

trial judge "invite[d] Counsel and [Irwin] if he wants to, any conference at the bench . . .

Assuming [Irwin did]n't come up, [the Judge] . . . expect[ed] him to waive that right."  T. 21.

Graham affirmatively responded to the Judge's instruction.  T. 21.  Irwin did not participate

in any of the side bar conferences.  During jury selection, Graham actively participated in

voir dire.  T. 58-60, 107-41, 188-93, 224-45, 273-78.

 During jury selection, one of the jurors indicated that she would be unable to believe

two of the individuals on the prosecution's witness list because of professional interactions

she had with both individuals.  T. 62-63, 126, 136.  The prosecution declined to seek the removal of one of these jurors for cause who had indicated that she would have difficulty believing the prosecution's witnesses.  T. 141-42.  Graham commented that "the prosecution d[id not] have any other questions for cause [when] . . . jurors . . . came up and said that they would have difficulty with respect to specific witnesses which were on the prosecution's list."  T. 142.  Graham exercised peremptory challenges, modifying them after conferring with Irwin.  T. 143, 246.

## B. Trial

On November 7, 2001, Graham and Irwin attended a pre-trial conference with opposing counsel.  T. 281-96.  During the conference, Graham argued that Officer Oliveau should not be allowed to testify to the statements of Smalls when he arrived at the gas station, testimony from the grand jury should be delivered to the jury by a neutral party such as a court reporter, and the final charge of intimidating a witness should be dismissed because he did not have appropriate notice of the charge as he was missing a page of the indictment.  T. 288-92, 337-53.  The trial judge ruled on these motions and the trial commenced.

The jury found that Irwin attacked and stabbed Smalls in a car outside a house party.  The prosecution's evidence established that earlier in the evening, Irwin had stated that he planned to assault Smalls because of Smalls' statements to the police which helped form the basis of Irwin's previous felony arrest.  T. 399; see also T. 436, 488-90 (discussing with the investigating officer the number and quality of reports given regarding Irwin's first felony in 1999). Prosecution witnesses testified that later that evening, Smalls

4

was sitting in a car outside the house party when he was approached by Irwin and two other males and an altercation ensued.  T. 361, 384-87, 400-02, 431-33.  Some of the witnesses testified that the attack seemed to be nothing more than a fist fight (T. 393, 454), but others saw Irwin with a knife (T. 402, 433-34, 436, 441).  A prosecution witness testified that he prevented people from approaching the altercation, telling the group "not to jump in [because] . . . it was going to be one-on-one."  T. 416; see also T. 434 (stating that Irwin told the crowd to "mind their business" before fleeing the scene), 440, 504.  After a few moments of fighting, Irwin was restrained from further assaulting Smalls and Smalls crawled into the drivers seat and drove away from the scene.

Irwin's witnesses' testified to a different chain of events.  Irwin testified that (1) if he had attacked Smalls, his military training would have caused more serious injuries; (2) Irwin was actually approached by Smalls that evening and it was Smalls who was the aggressor; (3) a "little tussle" ensued and both Irwin and Smalls fell into the passenger side of the car in which Smalls was seated; and (4) during the fight Irwin struck Smalls with an open hand only before his friend pulled Irwin away.  T. 446-52.  Defense witnesses claim that they were with Smalls in the vehicle, they pulled the vehicle over so that Smalls could approach Irwin outside the house party, Smalls instigated the wrestling match, and no one else was present to witness the events.  T. 538-43, 562-65.  There were no reports of blood or a knife.  T. 542-43, 548, 553, 565.

Smalls drove to a gas station where he exited his vehicle and collapsed in the parking lot.  T.376-77, 379, 434.  Smalls was lying in a pool of blood and had left a trail of blood from his car to where he ultimately collapsed.  T. 357-58, 380, 461-62.  There was blood inside Smalls' car And on his clothes.  T. 358, 364-65,368-69, 462-63.  Officer

Oliveau arrived at the scene, and noted that Smalls was going into shock.  T. 357, 359.
Smalls was later described by medical staff to be "acutely intoxicated."  T. 530; see also T.
537-38, 560-61.  Smalls' wounds were open, he had a laceration on his right hand and two
more on his left arm, one of which "appeared to have a piece of flesh missing about the
size of a quarter."  T. 359; see also T. 370, 492-94.  While still at the gas station, Smalls
told Oliveau that he had been stabbed by Irwin, also describing the knife which Irwin used
in the attack, because he had given a statement to police against Irwin in connection with
an earlier incident.  T. 360-61, 373.

Smalls was taken to the local hospital and ultimately transferred to Upstate Medical
in Syracuse for emergency surgery on his hand.  T. 362, 520.  Smalls suffered lacerations
to his right hand and left arm, with tendon and nerve damage in the hand which required
surgery.  T. 521-22.  The surgeon indicated that this was "a serious injury to the hand,"
that if left untreated the finger would not flex properly, and that while "you probably would
not be too disabled," the finger would not work correctly and you would suffer from
significantly decreased grip strength.  T. 524-28.

A prosecution witness, Hines, alerted police to where the knife was hidden that was
allegedly used in the stabbing.  T. 403, 502-03.  Hines knew of the whereabouts of the
knife because he overheard Irwin talking about where he had buried it.  T. 404.  The
officers arrived at the address provided to them on October 26, an address that Irwin often
frequented but did not reside, and using a metal detector, recovered a dirty, rusty, "large
machete style knife . . . ."  T. 494-97.  Hines identified the knife as Irwin's and was the one
used on Smalls on September 3, 2000.  Id.

6

During the investigation, police officer Golden found it difficult to contact individuals and receive statements.  T. 500-502.  No fingerprints were found in the interior of the vehicle in which the fight occurred or on the handle of the knife.  T. 469-70.  Irwin was incarcerated in March of 2001 on other charges.  T. 436.  During that time, Irwin saw a prosecution witness, Sydne Lee, who was also incarcerated at the same facility, during church services and threatened the safety of her and her family by motioning to her that he would cut her throat while warning her that "snitches get stitches."  T. 436-37.  Irwin also befriended another inmate and he divulged to that inmate that he went after Smalls, cutting him, while he sat in his car on Clay Street because "snitches get stitches".  T. 480-81.  Irwin told the inmate that after the attack,, he ran to a certain address and buried the knife in the backyard.  T. 481.  Irwin also stated that he was glad for the scar that was left on Smalls' hand because it would be a constant reminder to him.  T. 481-82.

Graham requested a charge on accomplice corroboration but later withdrew the request.  T. 596.  Graham also renewed the motion to dismiss the count for Intimidating a Witness because it was not previously disclosed to him.  T. 514.  The motion was ultimately denied.  T. 514-17.  Graham also sought redactions to the medical records, which was ultimately granted.  T. 588-95.  Graham also obtained an instruction cautioning the jury on publicity about the case.  T. 609-11.  Graham delivered a closing argument.  T. 617-45.  Graham also moved to dismiss the case for lack of sufficient evidence on the first three counts as to a serious physical injury.  T. 712-715.  The Judge denied the motion.  T. 715.  The jurors returned their verdict, and again, Graham's motion based on insufficiency of the evidence was renewed and denied.  T. 721-26.

7

## C. Sentencing

At the sentencing on December 19, 2001, Graham renewed his motion for dismissal based on sufficiency of the evidence.  S. at 4-5.  Graham also argued that Irwin required care other than incarceration, seeking the trial judge to accommodate such requests in the best interests of Irwin.  S. at 7-9.  Irwin also asked the trial judge to reconsider the evidence, and character of those testifying against him, maintaining his innocence.  S. at 9-10.  The trial judge stated that Irwin's attack was vicious, the weapon was "brought to the scene . . . for one purpose, and one purpose alone," and that the situation could have been much worse.  S. at 11-12.  Irwin was then sentenced as indicated above.

## D. State Court Appeals

Irwin appealed from the judgment of his conviction, filing briefs both from his appellate counsel and pro se.  Dkt. No. 50-31.  The Appellate Division denied the appeal. People v. Irwin, 5 A.D.3d 1122 (4th Dep't 2004);l Dkt. No. 50-32 at 5-6.  The court held that there was sufficient evidence to convict because:

> Medical evidence established that, as a result of the stabbing, the victim lost two liters of blood before he was attended to by emergency medical personnel, and thus the jury could properly find that if the injuries had been left untreated the victim could have bled to death.  Furthermore, the victim's wounds required surgery and, although the victim was unavailable to testify, photographs depicting the sutured wounds to the victim's arm and hand were admitted into evidence.  We conclude that the jury could reasonably infer from that evidence that the sutured wounds resulted in permanent scars.

Id. at 1123.  Additionally, with regards to the additional claims asserted in Irwin's pro se

brief, the court found that those "contentions . . . are without merit." Id.  Irwin and his appellate counsel both sought leave to appeal to the state Court of Appeals, but both were denied on June 23, 2004.  People v. Irwin, 3 N.Y.3d 642 (2004); Dkt. No. 50-32 at 16.

On November 9, 2007, Irwin filed a motion in Jefferson County Court seeking to vacate his conviction.  Dkt. No. 55-1 at 7-47; Dkt. No. 55-4 at 3.  On January 20, 2009, Irwin's motion was denied.  Dkt. No. 55-4.  On February 19, 2009, Irwin sought leave to appeal the County Court's denial of his motion.  Dkt. No. 55-5 at 2-47.  On September 22, 2009, the Appellate Division denied the leave to appeal.  Dkt. No. 55-7 at 2.


### E. Proceedings in Federal Court

On August 16, 2004, Irwin filed the present action.  Dkt. No. 1.  In a letter dated May 14, 2007, Irwin requested that the action be stayed to permit Irwin to return to state court to pursue then unexhausted claims.  Dkt. No. 22.  The request was granted.  Dkt. No. 23.  By letter dated September 28, 2009, Irwin informed the Court that Irwin had now exhausted all claims in state court.  Dkt. No. 37.  Irwin requested and received permission, to file an amended petition and on October 16, 2009, the stay was lifted.  Id.  On November 11, 2009, Irwin filed his amended petition.  Dkt. No. 39.

Presently pending are Irwin's claims that (1) trial counsel was ineffective as (a) he failed to offer an informed opinion on Irwin's plea deal; (b) he failed to investigate important facts that would have impeached a prosecution witness; (c) he did not allow Irwin to testify at trial; (d) he failed to submit the knife for fingerprint analysis; (e) he failed to protect Irwin's right to attend side bar conferences; (f) he failed to object to the Court's misstatements during sentencing; (g) failed to seek an appropriate jury instruction; (h)

failed to object to seating a biased juror; (i) failed to object to the jury taking notes; and (j) the cumulative weight of his failures rendered his representation ineffective; (2) the evidence was legally insufficient to sustain a conviction; and (3) Irwin was denied his right to be present at side bar conferences.  Am. Pet.; Dkt. No. 47.

## II.  Legal Standards

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant habeas review only if state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2) (1996).  When evaluating a habeas petition, "a determination of factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal court may review the habeas petition if the state court's application of Supreme Court precedent was "objectively unreasonable."  Id. at 409.

10

### III. Procedural Issues[6]

### A. Exhaustion

Before seeking habeas review, a petitioner must first exhaust all state remedies. 28 U.S.C. § 2254(b), (c).  The petitioner must have "given the state courts a fair opportunity to pass upon his federal claim." Daye v. Att'y Gen., 696 F.2d 186, 191 (2d. Cir. 1982).  The petitioner may alert the state court to his federal claim by citing the Constitution, relying on federal case law, relying on state cases employing constitutional analysis to a similar fact pattern, stating the claims in a specific way as to contemplate a constitutional provision, or presenting a fact pattern that is common in constitutional litigation. Id. at 194.

In this case, Irwin has exhausted his claims concerning sufficiency of the evidence by presenting them to the Court of Appeals, and newly amended claims regarding ineffective assistance of counsel by presenting them to the Appellate Division.  Dkt. Nos. 50-32 at 5-12, 16; 55-1 at 7-47; 55-2,-4; 55-5 at 2-47; 55-6,-7.  Additionally, Irwin presented his claims regarding the right to be present, the jury instruction regarding corroboration, the insufficient preliminary instructions on note taking, and his overall

---

[6] The respondent asserts that Irwin's exhausted, claims are untimely.  Dkt. No. 53 at 9-11.  However, the timeliness argument is a statute of limitations defense which is waivable.  Pino v. United States, No. 98-CV-92 (RCC), 2004 WL 1320888, at *2 (S.D.N.Y. 2004) (citations omitted).  The "defense . . . is waived if not pled at the earliest possible moment . . . ." Id.  When Irwin sought leave to amend his petition, respondent asserted a statute of limitations defense with respect to Irwin's appellate counsel claims, but not those regarding trial counsel.  Dkt. No. 42.  This position was accepted by the district court's order allowing amendment of certain claims in the petition.  Dkt. No. 44 at 4.  As the initial petition was never argued to have been untimely filed, Irwin's ineffective assistance of counsel claims which were added into his amended complaint are also timely as they relate back to the original petition.  Id.

allegations of ineffective assistance of counsel to the Appellate Division.  Dkt. No. 50-31 at

30-144.  However, Irwin never presented these claims to the Court of Appeals in his

application for leave to appeal.  Instead, he merely offered generalized complaints without

actually specifying which issues he sought to appeal.  Dkt. No. 50-32 at 7 (complaining

that Irwin's "appellate attorney has declined to request leave to be heard on the single

issue she briefed on direct appeal . . . [and] to address [Irwin's] pro se issues [which were

presented] to the appellate court or request leave of this court.").  Exhaustion of available

state remedies requires presentation of the claim to the highest state court from which a

decision can be had." Daye, 696 F.2d at 190 n.3.  Irwin did not present these claim to the

highest state court which may have rendered a decision and, therefore, these claims are

not exhausted.

While failure to exhaust claims generally prohibits a habeas court from evaluating a

claim on the merits, an unexhausted claim is deemed exhausted when there is no

alternative means to exhaust that claim.  See Castille v. Peoples, 489 U.S. 346, 351

(1989).  The lack of a state court forum to exhaust the claim results in "procedural default."

See generally  Reyes v. Keane, 118 F.3d 136, 140 (2d Cir. 1997) (citations omitted) ("[A]

claim is procedurally defaulted for the purposes of federal habeas review where 'the

petitioner failed to exhaust state remedies and the court to which the petitioner would be

required to present his claims in order to meet the exhaustion requirement would now find

the claims procedurally barred.'").  "The Court is precluded from considering this

procedurally defaulted claim unless [Irwin] can show cause for the default and prejudice

attributable thereto, or demonstrate that failure to consider the federal claim will result in a

fundamental miscarriage of justice." Hogan v. West, 448 F. Supp. 2d 496, 506 (W.D.N.Y. 2006) (internal quotation marks omitted) (citing Harris v Reed, 489 U.S. 255, 262 (1989)).

Under the first prong, "cause" can be established in a case alleging ineffective assistance of counsel by showing that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court," or that ineffective assistance of counsel was the reason for default.  Murray v. Carrier, 477 U.S. 478, 488 (1986). Additionally, "prejudice" exists where there is a "reasonable probability" that the result of the proceeding would have been difference but for the Constitutional violation.  Stickler v. Greene, 527 U.S. 263, 289 (1999).

Here, under the first prong, Irwin cannot demonstrate an external factor or other reason that "caused" the default as it was simply his failure to raise the ground for appellate review.  Accordingly, Irwin also cannot establish "prejudice."  See McCleskey v. Zant, 499 U.S. 467, 502 (1991) (holding that a court need not determine whether a petitioner suffered actual prejudice where "cause" is lacking for the procedural default). Under the second prong, Irwin cannot show that he was "actually innocent" of the stabbing, and, therefore, cannot establish any fundamental miscarriage of justice.  See Aparicio, 269 F.3d at 90.  Therefore, the initial claims regarding Irwin's right to be present, allegation of improper jury charges and preliminary instructions, and ineffective assistance of counsel are also in procedural default.

Even though certain of Irwin's claims are unexhausted and he is in procedural default, the AEDPA allows the writ to be "denied on the merits, notwithstanding the failure . . . to exhaust . . . ." 28 U.S.C. 2254(b)(2).  Thus, although the habeas petition includes

13

both exhausted and unexhausted claims, this court may still review the merits of these claims.

## IV.  Merits

### A.  Sufficiency of the Evidence

In seeking habeas corpus review, a petitioner who claims that the evidence was insufficient to sustain a conviction bears a "very heavy burden." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000).  "[T]he critical inquiry on the review of the sufficiency of the evidence . . . [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979).  The reviewing court must determine if, "after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  The reviewing court defers to the jury's determination as to the weight of the evidence and the credibility of the witnesses. United States v. Velasquez, 271 F.3d 364, 370 (2d. Cir 2001).

In considering the sufficiency of the evidence on a state conviction, the federal court must first examine state law to determine the elements of the crime.  Fama, 235 F.3d at 811.  Irwin was convicted of three counts of Assault in the First Degree under N.Y. Penal Law §§ 120.10(1)-(3).  All three charges alleged the same conduct, that on September 3, 2000, Irwin caused "serious physical injury" to Smalls.  Irwin contends that the evidence was legally insufficient to establish a serious physical injury and, therefore, all of the assault convictions must be overturned.  See generally Pet. Mem. of Law (Dkt. No. 47-1)

14

at 22-24.  The term "serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(10).

In this case, viewing the facts in the light most favorable to the prosecution, the evidence established that Irwin used a fourteen inch knife to stab Smalls in the hand and arm and caused a serious physical injury.  The stab wounds caused immense bleeding, with Smalls losing two liters of blood, evidenced by the pooling in the car and parking lot and the stains on Smalls' clothing.  Smalls also began to go into shock upon the arrival of the police.  See State v. Wigget, 707 P.2d 101, 106 (Or. 1985) (holding that being beat to unconsciousness and shock constituted a serious physical need as identically defined by the New York Penal Law) superceded by statute 765 P.2d 818 (Or. Ct. App. 1988).  Smalls' injuries required surgery to repair the tendons which had been severed, one fully and the other partially, in order to restore gripping and bending function in Smalls' hand and finger.  The scarring from the injury was touted by Irwin as a permanent reminder of his attack on Smalls for providing information to the police.  The jury observed the sutures as an aide to assessing injuries.

This evidence supported the jury's verdict that the physical injury created a substantial risk of death from the uncontrolled bleeding and caused serious disfigurement.  See People v. Wade, 590 N.Y.S.2d 245, 246 (2d Dep't 1992) (finding that a "cut [to] the victim's face with a razor, requiring stitches across the face from ear to mouth, and leaving a scar . . . ." was sufficient to establish a serious physical injury).  This evidence was found

sufficient by the Appellate Division, which explicitly held that a serious physical injury was indicated by the evidence presented at trial.  For the reasons stated in Section II above, these factual determinations require deference and a presumption of correctness as they have not been proven to be a contrary or unreasonable application of federal law.

Therefore, the amended petition on this ground should be denied.


## B.  Right to Be Present

"A criminal defendant is entitled to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."  Tankleff v. Senkowski, 135 F.3d 235, 246 (2d Cir. 1998) (internal quotation marks and citations omitted).  This right includes impanelment of a jury.  United States v. Hernandez, 873 F.2d 516, 518 (2d Cir. 1989).  "Under New York law, a defendant is entitled . . . to be present at sidebar discussions when the merits of the case or prospective jurors' backgrounds and their ability to weigh evidence objectively are discussed."[7]  Clark v. Poole, 440 F. Supp. 2d 235, 246 (W.D.N.Y. 2006) (internal quotation marks and citations omitted).  "However, federal standards . . . are less stringent than New York's . . . [and d]istrict courts in the Second Circuit have held that there is no right to be present at a sidebar conference during voir dire."  Clark, 440 F. Supp. 2d at 246 (citations omitted).

---

[7] This means that a defendant is properly excluded from those "side bars where juror qualifications such a[s] physical impairments, family obligations and work commitments are discussed," but the defendant's presence is required where "the juror's background and ability to weigh evidence are discussed."  Nichols v. Kelly, 923 F. Supp. 420, 426 (W.D.N.Y. 1996) (citations omitted).

"[T]he Second Circuit has held that, if the right to be present at sidebar conferences during voir dire exists, it is subject to harmless error analysis." Clark, 440 F. Supp. 2d at 248 (citing Sanchez v. Duncan, 282 F.3d 78, 81 (2d Cir. 2002); United States v. Feliciano, 223 F.3d 102, 110 (2d Cir. 2000) cert. denied 532 U.S. 943 (2001)).  Additionally, the right to be present is subject to waiver by either "the defendant himself, or defense counsel, and may be inferred from a defendant's conduct, such as the failure to contemporaneously object." Id. (citing cases) (internal quotation marks and citations omitted).

In this case, Irwin contends that his constitutional rights were violated when he did not participate in side bar conferences during voir dire, such that it resulted in a woman sitting on the jury who stated that she would have difficulty giving credibility to prosecution witnesses.  As this side bar was about the juror's ability to weigh evidence, it would appear that Irwin was required to attend it.  However, the failure to participate in the conference resulted in harmless error.

Irwin did participate in the final conference determining whether jurors should be dismissed for cause or pursuant to a peremptory challenge.  During that discussion, Graham made clear that this juror indicated that she could not be impartial with regard to all of the prosecution's witnesses.  This statement favored Irwin and, thus, there was no error in Graham allowing the juror to remain on the jury.  Additionally, Graham's statements were heard by Irwin, who thus was effectively apprised of the substance of the side bar conference.  Irwin nevertheless chose not to exercise a peremptory challenge against the juror.  Irwin pursued both of these actions with regard to a different juror in the

17

jury pool, demonstrating that Irwin understood and participated in the process.[8]

Lastly, even if the failure to participate in the side bar is not considered harmless error, Irwin effectively waived the right to take part in the side bars. Prior to the first side bar conference, the Judge instructed Graham and Irwin that Irwin was invited to attend the side bars and that Irwin's failure to accompany Graham to the bench would serve as a waiver to that participation. This statement was clear and unambiguous. Graham indicated that he understood the rules and proceeded to the bench for the side bars without Irwin. As previously stated, Irwin spoke with his counsel freely throughout the pre-trial matters, indicating that expressing himself to Graham was something that he was comfortable doing. Accordingly, with a clear instruction and Irwin's silence and failure to participate, it is clear that Irwin waived his right to participate in the side bars.

Accordingly, Irwin's amended petition on this ground should be denied.

### C. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a petitioner must prove that counsel's performance was (1) deficient and (2) caused actual prejudice to petitioner's defense. United States v. DeJesus, 219 F.3d 117, 121 (2d Cir. 2000). The first inquiry requires that a defendant show counsel's performance "fell below an objective standard of

---

[8] For the reasons previously stated, because allowing the juror to remain on the jury panel constituted harmless error, it cannot be said that the same actions were sufficient to establish that Graham's counsel was ineffective. Therefore, to the extent that allowing the juror to remain on the jury constituted ineffective assistance of counsel, such a claim is meritless because Irwin has failed to establish that it was prejudicial.

reasonableness." Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).  There is a strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.  The second inquiry requires the reviewing court to determine whether there is a reasonable probability that, but for counsel's deficient  performance, the outcome would have been different. Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

To determine whether counsel's performance was effective, the court examines "counsel's overall performance" as reflected in the record.  See Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); see also  Jeremiah v. Artuz, 181 F. Supp. 2d 194, 203-04 (E.D.N.Y. 2002) (finding counsel's assistance effective where he cast doubt on the prosecution's case through competent cross-examination and closing argument). Additionally, where counsel decided to focus on some issues rather than others, there is no cognizable habeas corpus claim for ineffective assistance of counsel because the court presumes counsel's choice was one based on tactical reasons.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

### 1. Advice on Plea Agreement

"[D]efense counsel must give the client the benefit of counsel's professional advice on th[e] crucial decision of whether to plead guilty."  Purdy v. United States, 208 F.3d 41, 44-45 (2d Cir. 2000) (internal quotation marks omitted) (citing Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996) (discussing various sources of instruction which support the proposition

that attorneys are to provide an informed opinion of whether or not to enter a plea) (citations omitted); Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999) (discussing Boria and the "general duty to advise a defendant concerning acceptance of a plea bargain.")).  "Even if there might be circumstances where defense counsel need not render advice as to acceptance of a plea bargain, . . . counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution." Cullen, 194 F.3d at 404.  Additionally, the defendant should be apprised "of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 45 (citations omitted).

"Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because representation is an art and there are countless ways to provide effective assistance . . . ." Purdy, 208 F. 3d at 45 (internal quotation marks omitted) (citing Strickland, 466 U.S. at 689, 693).  Factors to consider in determining how to properly advise a criminal defendant include "the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea . . ., whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." Purdy, 208 F.3d at 45; see also Goldberg v. Tracy, 247 F.R.D. 360, 366-67 (E.D.N.Y. 2008) (explaining that failing to "convey the terms of a plea offer to a defendant . . . is in effect a per se violation of the first prong of Strickland," and failure to offer a plea "which was significantly lower than the actual sentence" satisfied the second prong of Strickland).

20

In this case, it is undisputed that the prosecution's offer of three years was conveyed to Irwin.  Irwin then contends that Graham "did not make a recommendation and did not explain the strengths and weaknesses of [the] case.  Nor did he tell [Irwin] that [he] was facing a maximum of [fifteen] years on the assault charge. . . plus consecutive time on the witness intimidation charge . . . ."  Irwin Aff. (Dkt. No. 47-5) ¶ 8.  Irwin contends that if he had been advised to accept the offer, he would have, and that had Graham "explained . . . the strength of the prosecution's case and the fact that [his] witnesses were subject to impeachment, [he] would have weighed the risks differently and accepted the plea."  Id. ¶ 9.

It is undisputed that "the ultimate decision whether to plead guilty must be made by the defendant."  Purdy, 208 F.3d at 45.  Thus, Irwin's contentions that Graham should have affirmatively told him what to do is unavailing.  See id. at 46 (explaining that the Second Circuit had not instituted a rule that counsel had a per se duty to "advise the defendant to either plead guilty or not.").  Moreover, Graham conveyed the offer and its terms, as expressed to the Court in the pretrial matters, which remained unopposed by Irwin who was available and able to comment on the plea negotiations.  See Cullen, 194 F.3d at 404 (concluding ineffective assistance of trial counsel was apparent where the attorney failed to convey the plea terms to his client because "there can be no doubt that counsel must always communicate . . . the terms of any plea bargain offered by the prosecution.").  Furthermore, Irwin's contentions that Graham had refused to confer with him about the strengths and weaknesses of the complaint are belied by the conversations with and opinions expressed, and subsequently exercised on Irwin's behalf, by Graham

21

during pre-trial matters.  Accordingly, Irwin has failed to establish the first Strickland prong.

Moreover, Irwin's "best interests did not necessarily demand a guilty plea." Purdy, 208 F.3d at 47.  "The evidence against [Irwin], although strong, was considerably . . . complex . . .[resulting in a potentially] reasonable chance of acquittal." Id. (citing Boria, 99 F.3d at 495 n. 4, 498 (holding that where the attorney stated that "getting an acquittal in a drug case . . . was almost impossible," the attorney felt there was no possibility for acquittal and the plea agreement needed to be pursued based on the best interests of the defendant).  It was known by both parties that Smalls was unavailable to testify. Additionally, it was uncertain whether Smalls' statements to Officer Oliveau would be admissible because they were hearsay.  Furthermore, there were multiple witnesses, some of whom would offer conflicting and inconsistent recollections of what occurred that night.  Moreover, many of the witnesses had credibility issues, whether because of their criminal backgrounds or proclivity to engage in alcohol and drug abuse.  Therefore, there were arguably circumstances present under which the jury could have found that reasonable doubt existed and Irwin could not be convicted.  The case was not so unfairly balanced that conviction was a certainty. Boria, 99 F.3d at 495 n.4, 498.  Accordingly, "if [Irwin's] decision to go to trial turned out to be unwise, it was at least reasonable." Purdy, 208 F.3d at 47.

Even if Irwin's contentions could be deemed to satisfy the first prong of the Strickland analysis, there is nothing in the record to support that Irwin was prejudiced and would have accepted the offer had Graham approached him differently about it.  As the Appellate Division noted, the trial court judge engaged in a lengthy discussion in which she

expressed, and confirmed Irwin's understanding of, the minimum and maximum penalties Irwin would face if he were convicted.[9]  Moreover, Irwin was instructed that with his status as a second felony offender, his sentence was likely to exceed the minimum guideline sentence.  Accordingly, Irwin was apprised of the sentencing disparities in comparing a plea versus a conviction.  Additionally, during pre-trial proceedings, the prosecution revealed to Graham and Irwin that there were at least four individuals that had positively identified Irwin as the assailant and that the prosecution intended to call twenty-one witnesses in support of its case.  This information clearly gave an indication as to the strengths of the case against Irwin.  Furthermore, as previously stated, it was apparent that Smalls was an unavailable witness, a notable weakness.  Additionally, Irwin testified during the grand jury that he was innocent, admitting only to engaging in a "tussle" with Smalls on the evening in question.  Irwin was also aware, and rejected, the plea agreement, further maintaining his innocence.  Accordingly, the information provided during the pre-trial hearings and during the dialogue with the trial court satisfied Irwin's right to have the case against him fairly presented prior to deciding whether to accept a plea.  Even given all of this information, Irwin still decided to reject the plea agreement.

Accordingly, Irwin's amended petition should denied on that ground.

---

[9] It does not appear that Irwin was advised of the additional two to four years that he was in danger of receiving given a conviction for intimidating Sydne Lee as a witness. However, it is not substantial because Irwin was already cognizant that the difference between the stated mandatory maximum (twenty-five years) and the plea agreement (three years) were over twenty years in prison.  Given that large sentence disparity, and Irwin's decision not to accept the agreement, it is unreasonable to believe that knowledge of the potential additional time would have swayed his decision.

## 2. Note Taking by Jurors

Irwin alleges that the Judge failed to properly instruct the jurors on taking notes throughout the trial.  "It has been well established in this circuit that it is within the trial court's discretion to allow the jury to take notes."  United States v. Marquez, 449 F.2d 89, 93 (2d Cir. 1971).  Other federal courts have indicated that any "dangers of note-taking c[ould] be substantially avoided by proper instruction to the jury."  United States v. Maclean, 578 F.2d 64, 66 (3d Cir. 1978).  Specifically, "[j]urors should be instructed that their notes are only aids to memory and that they are not conclusive and should not be given precedence over their independent recollection of the facts. . . ."  Id. (citing inter alia United States v. Bertolotti, 529 F.2d 149, 160 (2d Cir. 1975)).  Additionally, jurors should be instructed that if they do not wish to take notes, they should not be influenced by the notes of another juror and should rely on their own recollection of the testimony and evidence.  Id. (citations omitted).

In this case, the trial judge properly exercised her discretion in allowing notes to be taken.  Additionally, the judge also properly advised the jurors on the proper use of the notes prior to the commencement of the trial and again before they commenced deliberations.  While Irwin states otherwise, he is factually mistaken as the record clearly demonstrates that the judge instructed the jurors prior to testimony beginning. Accordingly, the judge properly utilized her discretion and provided the necessary instructions.

Accordingly, Irwin's amended petition on this ground should be denied.

24

### 3. Fingerprint on the Knife

Irwin maintains that "if the knife were dusted for fingerprints, it would exculpate [him] by revealing that [his] prints were not on it . . . ."  Irwin Aff. ¶ 7.  To the extent that Irwin contends that Graham failed to effectively perform his duties by refusing to order fingerprint analysis of the knife, such contentions must fail.  First, such arguments fail to satisfy the first prong of the <u>Strickland</u> analysis because "defense counsel was a zealous advocate on petitioner's behalf and consistently argued that there were weaknesses in the State's case . . . ."  <u>Thompson v. Burge</u>, No. 05-CV-2914, 2007 WL 2020185, at *12 (E.D.N.Y. July 6, 2007).  Specifically,

> it was not unreasonable for counsel to decide that, rather than ask for a fingerprint test of the [knife], his client was in a better position to argue that the failure to fingerprint . . . presented a reasonable doubt precluding [petitioner's] conviction.  Counsel vigorously pursued this strategy by questioning the police about the failure to perform a fingerprint analysis, and then argued in his summation that such failure constituted reasonable doubt.

<u>Thompson</u>, 2007 WL 2020185, at *13.

Similarly in the present case, Graham questioned the police officers as to whether they were able to conduct fingerprint analysis and why they failed to do so.  Additionally, when it was determined that analysis could have been completed, but was not, Graham used this fact to argue reasonable doubt.  Furthermore, in denying Irwin's post-conviction motion, the trial court explained that because the knife was likely wiped clean before burial and certainly exposed to the elements for weeks on end, it was reasonable to conclude that no fingerprints could have been recovered.  Thus, there is "no basis to conclude that counsel's performance and strategic decisions . . . were unreasonable under <u>Strickland</u>."

Thompson, 2007 WL 2020185, at *13.

Furthermore, there is nothing in the record to suggest that Irwin has satisfied the second prong of the Strickland analysis because there is no basis to conclude, for all of the arguments previously stated, that the verdict would have been different in light of the overwhelming proof of guilt introduced during trial.

Moreover, to the extent that such arguments could pertain to the legal sufficiency of the evidence, such arguments are also without merit.  "With respect to the fingerprint evidence, there exists no requirement that any particular piece of evidence be introduced to support a conviction."  Martinez v. Artuz, No. 99-CV-5744 (WHP/GWG), 2001 WL 540737, at *6 (S.D.N.Y. May 22, 2001) (citing Maldonado v. Scully, 86 F.3d 32, 35-36 (2d Cir. 1996) (holding that guilt may, and was, properly "established entirely by circumstantial evidence . . . .") (quotation marks omitted); United States v. Sureff, 15 F.3d 225, 228-29 (2d Cir. 1994) (holding that circumstantial evidence is as good as direct evidence so that it was unnecessary to offer cocaine or direct testimony of drug transactions to sustain a conviction for conspiracy to distribute cocaine)).  Therefore, the failure to produce this evidence to establish guilt was inconsequential because taking the evidence in the light most favorable to the prosecution still results in overwhelming evidence which would permit a juror to conclude that Irwin was guilty of the crimes charged.  Thus, no matter what results would have come from a fingerprint analysis, they were an unnecessary to the eventual determination of guilt.  Thus, Irwin has failed to satisfy the legal sufficiency analysis.

Accordingly, Irwin's amended petition on this ground should be denied.

26

**4. Irwin's Decision Not to Testify**

"A criminal defendant has a constitutional right to testify on his own behalf and trial counsel must advise the defendant about the benefits and hazards associated with doing so." Parker v. Ercole, 582 F. Supp. 2d 273, 296 (N.D.N.Y. 2008) (internal quotation marks and citations omitted). The Second Circuit has held that

> Although counsel should always advise the defendant about
> the benefits and hazards of testifying and of not testifying, and
> may strongly advise the course that counsel thinks best,
> counsel must inform the defendant that the ultimate decision
> whether to take the stand belongs to the defendant, and
> counsel must abide by the defendant's decision on this matter.

Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). Accordingly, "any claim by the defendant that defense counsel has not discharged this responsibility . . . must satisfy the two-prong test established in Strickland . . . ." Id. (citations omitted).

In this case, Irwin has failed to establish that Graham was professionally deficient in his advice to Irwin not to testify. First, the record indicates that Irwin was fully aware of his right to testify, as he had already exercised that right during the grand jury proceedings. Irwin Aff. ¶ 12. Second, the record does not indicate that Graham prevented Irwin from testifying, only that he recommended against such testimony because it would leave Irwin vulnerable to questioning about additional criminal conduct of which the jury was not otherwise aware. Moreover, Graham indicated that the defense also had its own witnesses to offer testimony that Irwin was innocent, essentially rendering Irwin's testimony of his innocence cumulative and unnecessary. These facts indicate that Graham's advice was not professionally unreasonable or deficient. Therefore, Irwin has failed to satisfy the

first <u>Strickland</u> prong.

Additionally, even if the advice not to testify could be deemed professionally inadequate, it was not prejudicial.  For the reasons previously stated regarding the sufficiency of the evidence, it is clear that Irwin's testimony would not have refuted the evidence proffered by the prosecution, crediting it all as true, establishing his guilt.  This evidence included the weapon, a statement by the victim, Irwin's admission to an inmate, and multiple eye witnesses' testimony.

Accordingly, the amended petition should also be denied on this ground.


**5. Failure to Investigate**

"The duty to investigate is essential to the adversarial testing process because the . . . process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and . . . various defense strategies."  <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005) (citations omitted).  This requires "strategic choices made after thorough investigation of law and facts . . . [determining whether] to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  <u>Strickland</u>, 466 U.S. at 690-91.  "A particular decision not to investigate must be directly assessed for reasonableness . . . applying a heavy measure of deference to counsel's judgments."  <u>Id.</u> at 91.  Effective representation "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense or to scour the globe on the off-chance something will turn up."  <u>Greiner</u>, 417 F.3d at 321 (internal quotation marks and citations omitted).  Thus, "when there is reason to believe

that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Id.

Irwin contends that Graham's failure to investigate and interview corrections officers at the jail, in the hopes of providing Irwin with exculpatory evidence, was unreasonable.[10] Irwin Aff. ¶ 11.  Such contentions by Irwin where wholly conclusory, unsupported, and insufficient to form a basis for habeas relief.  See Mallet v. Miller, 432 F. Supp. 2d 366, 388 (S.D.N.Y. 2006) ("It is too easy for a defendant to claim after the fact, without supporting evidence, that he provided leads and information to his counsel that would have resulted in exoneration if used.")  Moreover, Graham's actions represented a tactical decision which was upheld and explained by the trial court in the post-conviction motion, finding that such an investigation and defense would be fruitless and potentially harmful because defendants often unsuccessfully asserted these claims which remained unsupported due to the limited number of DOCS staff members and their inability to prevent or notice every furtive communication between male and female inmates. See Walker v. Henderson, 492 F.2d 1311, 1313 (2d Cir. 1974) ("[T]he decision to call or bypass particular witnesses is peculiarly a question of trial strategy.").  Moreover, instead of attempting to focus on this unreliable line of questioning, Graham decided to attack the

---

[10] To the extent that Irwin contends Graham was completely unaware of the last count in the indictment, such contentions are belied by the record.  While Graham moved to dismiss the count due to a clerical error that his copy of the indictment omitted the last page attached, Graham's trial performance indicated that he was well aware of the charge.  Graham discussed the charge in summation.  T. 634-41.  Hence, Graham was prepared to argue the merits of the indictment even though he felt that tactically, it was more advantageous to do so in summations instead of introducing testimony from an officer that may not have been helpful, the individuals that were incarcerated, or the possibility of the threat occurring.

credibility of Lee, establishing inconsistencies and questionable moral character through cross examination and summations.  Accordingly, Graham's tactical decision not to investigate this defense appears, and has already been judicially determined, as reasonable given the circumstances of the case.

Accordingly, Irwin's amended petition on this ground should be denied.


### 6. Failure to Object at Sentencing

An individual may not be sentenced based upon "materially untrue [assumptions] . . . whether caused by carelessness or design, [as that] is inconsistent with due process [rights] . . . ."  Townsend v. Burke, 334 U.S. 736, 741 (1948).  "[J]udges have the authority to exercise broad discretion in imposing a sentence . . . [but they] cannot . . . rely on information that is clearly unreliable or inaccurate."  Jones v. Donnelly, 487 F. Supp. 2d 403, 416-17 (S.D.N.Y. 2007) (citations omitted).

In this case, Irwin has failed to establish that statements at his sentence were unreasonable or based on information that was unreliable or inaccurate.  In its decision on the post-conviction motion, the trial court explained why Irwin received the sentence he did and how the references to the "machete" knife and actions of Irwin's friend in preventing him from injuring Smalls further affected the sentence.  The trial court notes that it observed the knife during trial, it was 14" long, and had a handle which could inflict gash wounds on others.  Therefore, the characterization as a "machete" was reasonable. Moreover, the characterization had no impact on the sentence as the evidence relied upon by the trial judge included the facts that Smalls was stabbed with a large knife, Irwin

possessed it, and possession of a weapon that large evinced an intent to use it for harmful purposes.

Additionally, the trial court's statements regarding Irwin's friend's actions were in regard to the finding that Irwin recklessly endangered Smalls' life as evidenced by the circumstances of the attack and severity of the wounds.  This evidence was also expressly upheld by the Appellate Division which concluded that due to the blood loss resulting from the vicious attack upon Smalls, he could have bled to death had any other time elapsed or events transpired prior to medical attention being provided to him.  Furthermore, this statement was supported by Irwin's own grand jury testimony which indicated that his friend pulled him off Smalls during the attack.

Given the fact that the Judge relied upon reasonable facts and information during sentencing, Irwin has failed to establish a basis upon which to grant federal relief.  Furthermore, Graham's actions in not objecting to the statements was also reasonable given the fact that he wished not to inflame the judge prior to her handing down a sentence for Irwin.  Such trial tactics were reasonable and afford no basis for granting a writ.

Accordingly, Irwin's amended petition should be denied on this ground.


## 7. Jury Instructions

It is well established "that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  See generally Estelle v.

McGuire, 502 U.S. 62, 67-68 (1991) (citations omitted).  For federal relief to be granted "on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated the state law but also that the error violated a right guaranteed to him by federal law."  Casillas v. Scully, 792 F.2d 60, 63 (2d Cir. 1985) (citations omitted); see also Cupp v. Naughten, 414 U.S. 141, 146 (1973) (holding that before a federal court can disturb a state court conviction based on the jury "instruction . . . used, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [Constitutional] right . . . .") (internal quotation marks omitted).  "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle, 502 U.S. at 71-72.  The ultimate question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Cupp, 414 U.S. at 147.

In this case, Irwin has failed to proffer facts which establish that the omission of a corroborating accomplice charge infected his trial so that his constitutional rights were violated.  To the extent that Hines' testimony required the jury charge in order to ensure the juries found "corroborative evidence tending to connect Irwin with the commission of the offense," such arguments are "entirely based on a New York State rule of evidence . . . [and t]he federal constitution does not prohibit the conviction of a petitioner based on the uncorroborated testimony of an accomplice."  Young v. McGinnis, 411 F. Supp. 2d 278, 299 (E.D.N.Y. 2006).  Therefore, Irwin has failed to allege the deprivation of a federal right for the failure to instruct the jury as to corroboration.

Moreover the record demonstrates that Graham initially requested, and was

32

granted, a corroborating accomplice charge.  Upon further review, and after hearing the

trial testimony, Graham sought to withdraw his previous request because Graham felt that

it would lead the jurors to rest conviction solely on the credibility of Hines' testimony.

Instead, Graham requested an alternate charge, to which the trial court agreed, in the form

of an interested witness charge, which more fairly represented the defense's theory.  This

request, and the subsequent dialogue, all discussed in the presence of Irwin, were logical,

without objection, and non-prejudicial since changing the jury instructions to an interested

witness charge allowed more flexibility in arguing and considering the evidence.  Thus,

Irwin has failed to demonstrate that the jury instructions resulted in a constitutional

deprivation.

Accordingly, Irwin's amended petition should be denied on this ground.


### 8. Overall Performance

To the extent that Irwin argues that his contentions, in isolation or combination,

resulted in ineffective assistance of counsel, such allegations are meritless.  As Graham

committed no prejudicial errors with regard to any of the above discussed instances, there

is no cumulative effect of his errors which would warrant habeas relief.  Lindstat v. Keane,

239 F.3d 191, 199, 204-05 (2d 2001) (instructing courts to apply the Strickland test with

respect to the professional and prejudicial effect that the aggregate errors had on the trial).

Graham filed an omnibus motion, moved for and participated in a pretrial hearing,

participated in plea negotiations, was actively involved in voir dire, and made a motion to

dismiss a count in the indictment prior to testimony ever being offered.  Additionally,

33

Graham delivered cogent opening and closing arguments and challenged the credibility and decisions of prosecution witnesses through cross examination.  Graham also presented two defense witnesses who testified to contrary events occurring on the night in question.  At the end of the trial, Graham sought dismissal of the conviction on the grounds of insufficient evidence.  Irwin contends that Graham failed to communicate with him or inform him of his trial strategies.  These contentions are belied by the record which indicated that Graham discussed jury selection and the plea offer with Irwin and that Graham was more than adequately prepared for trial.  Also, trial strategies are virtually unreviewable so long as they are reasonable.  Nothing has been proffered to indicate that anything Graham did, even if it was something that Irwin did not understand or agree with, was unreasonable and sufficient to satisfy Strickland.  Furthermore, Irwin has failed to establish that this representation or any of the above discussed items resulted in any prejudice to him during the trial.

Therefore, the amended petition on this ground should be denied.


## V.  Conclusion

For the reasons stated above, it is recommended that the amended petition for a writ of habeas corpus (Dkt. No. 47) be **DENIED**.

Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209

34

F.3d 107, 112 (2d. Cir. 2000).  Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.   Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan, 984 F.2d at 89 (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**
Dated: September 13, 2010
      Albany, New York

_David R. Homer_
United States Magistrate Judge

35